IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CYNTHIA ROSEBERRY-ANDREWS

    Plaintiff

v.

SCHELL & KAMPETER, INC. d/b/a
DIAMOND PET FOODS, AND DIAMOND
PET FOODS INC.

    Defendant

Civil Action No.: GJH-15-CV-1503

## MOTION TO DISMISS FOR IMPROPER VENUE AND FOR FAILURE
## TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Now come the Defendants, Schell & Kampeter, Inc. d/b/a Diamond Pet Foods, and Diamond Pet Foods, Inc., (hereinafter "Defendants"), by their attorneys, Mark J. Strong and The Law Offices of Jonathan P. Stebenne, and file this Motion to Dismiss the Complaint filed by the Plaintiff Cynthia Roseberry-Andrews, (hereinafter "Plaintiff"), and in support thereof state:

That on April 2, 2012, during routine retail testing of dry pet food, the Michigan Department of Agriculture and Rural Development detected Salmonella in an unopened bag of Diamond Naturals Lamb Meal & Rice dry dog food. Department of Health and Human Services investigation found a number of issues at the Gaston, SC manufacturing facility of Diamond Pet Foods and determined that those issues were the likely source of the contamination.

On May 4, 2012, Diamond Pet voluntarily recalled several brands of dry dog and cat food that had been manufactured in its Gaston, SC facility between December 9, 2011 and April 7, 2012. On May 18, 2012, the recall was expanded to include additional product distributed in 13 states and Canada.

Two petitions for class certification were filed, one in Superior Court of the Province of Quebec-District of Montreal and the second in the United States District Court, Eastern District of New York. The latter Class Action, properly filed under Fed Rule Civ. Proc. 23, is entitled **Marciano v. Schell & Kampeter, Inc. d/b/a Diamond Pet Foods, et. al.**, Case # 12-2708.

1. As to the action in the USA, a Settlement Agreement (hereinafter "the agreement" and attached here as **Exhibit 1**) was agreed to between the putative Plaintiff class and all Defendants, and signed by representatives of all parties on January 28 & 29, 2014. This agreement included a requirement for "dissemination of notice on a national basis to putative class members by publication in print and digital media." This included a requirement that a temporary website be set up to inform and allow putative class members to ask questions and otherwise participate in the action.

2.  That pursuant to the attached Affidavit (herein after "the affidavit" and attached here as **Exhibit 2**) of Kenneth Jue, a case manager for Gilardi & Co. LLC (hereinafter "Gilardi"), the following steps were undertaken by Gilardi to facilitate settlement administration of the Class Action arising out of the above events:

      (a)    established a toll-free phone number to assist callers through an automated Interactive Voice Response ("IVR") telephone system;

      (b)    trained call center representatives to assist potential class members with questions, requests or assistance;

      (c)    established and maintained an interactive Settlement website for purposes of posting Settlement information and general case information, such as the Long Form Notice, the Claim Form, the Order of Preliminary Approval, the Settlement Agreement, and the Complaint;

      (d)    established an online marketing campaign to reach potential class members;

      (e)    accepted and maintained documents sent from Settlement class members, including Claim Forms, Requests for Exclusion, and other documents relating to claims administration, and sent paper claim forms upon request; and

      (f)    determined the validity and administration of claims for the allocation of benefits.

1.  As explained in the affidavit, Gilardi provided telephone and email support, created an informational website and an online marketing campaign.  A wire release was released through Business Wire on March 13, 2014.  A notice was published in the USA Today on March 17, 2014.

2.  The website included a "Frequently Asked Questions" section.  Included, in pertinent part, are the following questions and answers:

> ### *If I don't exclude myself, can I sue Diamond Pet Foods and Costco for the same thing later?*
>
> *Unless you exclude yourself, you give up the right to sue Diamond Pet Foods and Costco for the claims that this settlement resolves. If you have a pending lawsuit, speak to your lawyer immediately. You must exclude yourself from this Class to continue your own lawsuit.*
>
> ### *If I exclude myself, can I get money from this settlement?*
>
> *No. If you exclude yourself, you are choosing to not be a part of this lawsuit and will not receive benefits from this settlement....*

3.  The claim filing deadline was July 11, 2014.

4.  The agreement permitted putative members of the class to "opt out" of the class.  The deadline to submit a request for exclusion ("opt out") was April 24, 2014.

5.  The agreement permitted putative members of the class to object to inclusion in the class.  The deadline for submitting an Objection was April 28, 2014.

6.  *Plaintiff did not submit a Request for Exclusion and did not submit an Objection.*

7.  The court, The Hon. Sandra Feuerstein presiding, summarily declared the case to be settled, approving the agreement on October 30, 2014

8.  The Plaintiff's lawsuit was filed on August 12, 2015.  The Complaint is attached here as **Exhibit 3**.

9.  Plaintiff's suit seeks precisely the type of economic damages that were the subject of the class action. Plaintiff's failure to opt out of the Class Action settlement should thus constitute a bar to her individually filed suit.  A remedy was readily available to her via the Class Action.  She did not avail herself of that remedy.  Had she wished to pursue a case individually, a process existed through which she could have done so.  She did not, and the option to do so no longer exists. The purpose of this and any other Class action suits would be completely undermined if this Plaintiff were allowed at this time to individually pursue her case

10.  According to Advisory Committee Notes for Rule 23, "(O)ne person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or virtual dilemma which would thus confront the party opposing the class."  The matter has been stated thus: "The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways." Louisell & Hazard, *Pleading and Procedure; State and Federal* 719 (1962); see **Supreme Tribe of Ben-Hur v. Cauble**, 255 U.S. 356, 366 –67 (1921).

11.  In other words, a resolution by way of Class Action helps avoid costly, repetitive litigation and, perhaps more importantly, avoids a "risk of inconsistent or varying determinations....Actions by or against a class provide a ready and fair means of achieving *unitary* adjudication." (Emphasis added).  See **Maricopa County Mun. Water Con. Dist. v. Looney**, 219 F.2d 529 (9th Cir. 1955); **Rank v. Krug**, 142 F.Supp. 1, 154–59 (S.D.Calif. 1956), on app., **State of California v. Rank**, 293 F.2d 340, 348 (9th Cir. 1961); **Gart v. Cole**, 263 F.2d 244 (2d Cir. 1959), cert. denied 359 U.S. 978 (1959); cf. **Martinez v. Maverick Cty. Water Con. & Imp. Dist.**, 219 F.2d 666 (5th Cir. 1955).  A Class Action is efficient, in that (again drawn from the Advisory Committee Notes for Rule 23), a "judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual's actions would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit."

12.  It's also important to remember that the role of "class counsel" is to represent the best interests of the class.  Should a putative member of the class decide he or she wants no part of the Class Action, it is well-established that they are not kept in the class against their will.

But should that person not avail themselves of the options available to extract themselves from the class, they do not reserve the right to later file their own suit once deadlines have passed.

WHEREFORE, it is respectfully requested that that the Complaint filed by Cynthia Roseberry-Andrews be DISMISSED with prejudice and that the Defendant be granted any additional relief to which it is entitled by law.

Respectfully submitted,

Mark J. Strong
Fed Bar No. 26906
Law Office of Jonathan P. Stebenne
100 South Charles Street, Suite 1101-Tower II
Baltimore, MD 21201
(410) 752-0575
mark.strong@libertymutual.com
Counsel for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 5, 2015, a copy of the foregoing Motion to Dismiss for Improper Venue and for Failure to State a Claim upon Which Relief can be granted and proposed Order have been e-mailed and/or mailed to:

Cynthia Roseberry-Andrews
P.O. Box 711
North Beach, MD  20714
Pro Se Plaintiff

Mark J. Strong

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| CYNTHIA ROSEBERRY-ANDREWS | |
|    Plaintiff | |
| v. | Civil Action No.: GJH-15-CV-1503 |
| SCHELL & KAMPETER, INC. **d/b/a** DIAMOND PET FOODS, AND DIAMOND PET FOODS INC. | |
|    Defendant | |

## ORDER

Upon consideration of the Defendant's Motion to Dismiss for Improper Venue and for Failure to State a Claim Upon Which Relief can be Granted, and any Response filed, it is on this

_____ day of_____, 20___, hereby,

**ORDERED**, that the Complaint filed by Cynthia Roseberry-Andrews is DISMISSED and that the Defendant be granted any additional relief to which it is entitled by law.

_____
JUDGE

# EXHIBIT 1

## SETTLEMENT AGREEMENT

This Proposed Settlement Agreement is made and entered, as of January 28, 2014, subject to Court approval, on behalf of the putative Plaintiff Class (as defined below) and Defendants (as defined below).

RECITALS:

WHEREAS, Plaintiff has commenced the "Diamond Pet Food Recall Litigation" (as defined below) in connection with the recall of certain pet food placed by Defendants into the stream of commerce in 2011 and 2012;

WHEREAS, Plaintiff in the Diamond Pet Food Recall Litigation has alleged that Defendants breached their warranties, were negligent, were strictly liable, violated state statutes prohibiting unfair or deceptive trade practices and/or were liable under other theories;

WHEREAS, Plaintiff contends that she and other members of the class have sustained damages and other injuries as a result of Defendants' actions;

WHEREAS, Defendants deny each and every allegation of unlawful or improper conduct, damages or other injuries;

WHEREAS, after good faith arm's length negotiations between Counsel for Plaintiff and the Class (as defined below) and Defendants, this Proposed Settlement Agreement has been reached;

WHEREAS, the class representative and Counsel for Plaintiff have concluded, after careful inquiry and investigation of the relevant facts and circumstances, that it is in the best interest of the Class to enter into this Settlement Agreement;

WHEREAS, both the Class Representative and Counsel for the Class consider this settlement to be fair, reasonable, adequate and in the best interests of the Class;

WHEREAS, Defendants have concluded that they will enter into this Settlement Agreement, among other reasons, in order to avoid the further expense, inconvenience, burden, uncertainty and risk of litigation;

NOW, THEREFORE, it is agreed by the undersigned on behalf of the Class and Defendants that all claims as set forth in the Diamond Pet Food Recall Litigation and specifically defined below be fully settled and compromised on the following terms and conditions:

TERMS AND CONDITIONS:

## I.  DEFINITIONS

Under this Settlement Agreement, the following terms shall have the meanings set forth below:

A.      "Plaintiff" or "Class Representative" means Barbara Marciano.

B.      "Plaintiff Class" means the settlement class preliminarily certified and approved by the Court and is defined as follows:

> All persons and business entities who purchased "Recalled Pet Food Product(s)" as defined in this Section and subsequently incurred an expense or economic damages as a result thereof as further defined in Section III.B, below.

C.      "Class Counsel" means the law firm of Robbins Geller Rudman & Dowd LLP, who has been judicially approved as lead counsel for the Plaintiff Class.

D.      "Defendants" mean Schell & Kampeter, Inc. d/b/a Diamond Pet Foods, Diamond Pet Food Processors of South Carolina LLC,   Costco Wholesale Corporation and all persons and entities that are alleged to have manufactured, tested, distributed, supplied, sold, offered or were otherwise involved in placing the Recalled Pet Food Products (defined herein) which are the subject of the Released Claims (defined herein) into the marketplace, as well as their insurers,

2

parent companies, subsidiaries, affiliates, franchisees, officers, directors, trustees, shareholders, unit holders, governors, managers, employees, agents and assignees.

      E.     "Defendants' Counsel" means the law firm of Traub Lieberman Straus & Shrewsberry LLP.

      F.     "Diamond Pet Food Recall Litigation" means the action entitled *Marciano v. Schell & Kampeter, Inc. d/b/a Diamond Pet Foods, et al.*, Civil No. 12-2708, pending in U.S. District Court for the Eastern District of New York, and subsumes all other known and unknown actions pending in any other venue within the United States and its territories that assert claims for economic damages caused by the Recalled Pet Food Products.

      G.     "Recall" means the voluntary recalls of the Recalled Pet Food Products in April and May of 2012, that were manufactured, tested, distributed, supplied, sold, offered or were otherwise placed into the stream of commerce by Defendants.

      H.     "Recalled Pet Food Products" means pet food products that:

          (1)     were made or manufactured by defendant Schell & Kampeter Inc. and/or Diamond Pet Food Processors of South Carolina LLC;

              AND

          (2)     that were offered for sale, sold, or otherwise made available or provided to Plaintiff Class members by dealers or retailers in each of the fifty (50) states and Puerto Rico;

              AND

          (3)     that are listed with particularity on Appendix A to this Settlement Agreement.

      I.     "Released Claims" means all claims that have been raised, could have been raised or relate in any way to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in any claim raised by the

Plaintiff and/or Plaintiff Class member in the United States in the Diamond Pet Food Recall Litigation. The Released Claims extend to any claims that have been raised or that could have been raised in any forum in the United States, including Puerto Rico, having the same or similar claims as those pending in the Diamond Pet Food Recall Litigation and include any such claim that has been raised or could have been raised against any persons or entities that are alleged to have manufactured, distributed, tested, supplied, sold, offered or were otherwise involved in placing the Recalled Pet Food Products into the marketplace, as well as their insurers, parent companies, subsidiaries, affiliates, franchisees, officers, directors, trustees, shareholders, unit holders, governors, managers, employees, agents and assignees. Released Claims do not include any claim for breach of the Settlement Agreement.

J.      "Objection Date" means the date by which members of the Plaintiff Class must file with the Court and serve on Class Counsel and Defendants' Counsel notice of any objection or opposition to the Settlement Agreement or any part or provision thereof.

K.      "Settlement Claims Administrator" or "SCA" means Gilardi & Co., LLC, a class action claims administration firm selected by the parties and approved by the Court designated to manage specified parts of the notice program, process claims, issue checks for Plaintiff Class members, and related tasks as set forth herein. The SCA shall be jointly supervised by Class Counsel and Defendants' Counsel and copies of all information, data, or correspondence regarding any claim made by a Class Member sent to the SCA by counsel shall be simultaneously sent to opposing counsel.

L.      "Settlement Fund" shall mean the amount set aside by Defendants to settle all claims and attorneys fees and costs in this case and shall define the Defendants' maximum liability under this settlement agreement.

4

M.    "Value of the pet" means the fair market value of a pet.   It does not include loss of affection, mental anguish, emotional suffering and does not include the costs of burial or cremation.   A pet that is a recognized breed shall be valued by the breed, recognized type or other extraordinary factor, (i.e., service animal, etc.), its age, its medical condition and other similar factors.

## II.   COURT APPROVAL, CLASS NOTICE, AND OBJECTION PROCEDURES

A.    Reasonable Efforts:

Class Counsel and Defendants' Counsel agree that they will use reasonable efforts to recommend and obtain approval of this Settlement Agreement to the Court and then carry out its terms.

B.    Motion for Preliminary Approval:

Class Counsel shall submit to the Court within ten (10) days of the signing of this agreement a motion for preliminary approval of the Settlement Agreement, including a motion for certification of a settlement class, together with a proposed approval order.

C.    Notice:

1.    The notice to the class shall be in the form attached as Exhibit 1.

2.    In the motion for preliminary approval of this Settlement Agreement, Class Counsel shall apply to the Court for an order authorizing dissemination of notice on a national basis to putative class members by publication in print and digital media. The SCA shall be responsible for placing notices in print and digital media.

3.    After notice has been provided by the SCA, the SCA shall certify to the Court the dates that notices were actually published in each print or digital media source, provide a true copy of each notice in each publication and provide other pertinent information relative to the publication and notice.

4.    Class Counsel shall also apply to the Court for authorization of notice by defendant Costco Wholesale Corporation, by e-mail where said defendant actually has in its possession, custody and control the email address of a putative class member. Defendant Costco

5

shall provide notice by way of post-card to any putative class member for whom Costco does not possess an e-mail address or for any class member whose e-mail notification is returned as undeliverable.   In the event any post-card notices are returned because they were sent to incorrect addresses, defendant Costco Wholesale Corporation shall utilize a change of address service to ascertain and mail notice to the new addresses.

5.   .   After the mailing .has been completed, defendant Costco Wholesale Corporation shall certify to the Court the number of putative class members to whom notice was provided, the manner in which notice was provided and the pertinent information regarding change of addresses and reissuance of notices.

6.   Subject to approval of the Court, the aforementioned notice will direct putative class members to a website maintained by the SCA from which claim forms can be obtained and submitted.   The SCA shall also provide a telephone number class members can call to ask questions regarding the settlement. The website shall be activated for a period of one hundred and twenty (120) days starting from the date the Court preliminarily approves the Settlement Agreement.

7.   Defendants shall bear the costs of the notice, which shall be paid from the Settlement Fund, whether by print media, digital media, individual media or otherwise.

8.   Class Counsel or Defendants' Counsel, as the case may be, shall cooperate to make reasonable inquiry to determine that the notices are actually published or provided.

D.   Opt Out:

During the one hundred and twenty (120) day period during which notice is provided to and claims are submitted by putative class members, class members will also be given the opportunity to opt out of the class.   A putative class member must opt out by notifying the SCA in writing of their intention to opt out of this settlement.   The putative class member must include his/her name, address, telephone and signature.

E.   Procedures for Objecting to the Settlement:

Any member of the Class may appear at the hearing on final approval of the Settlement to present any objection to the Settlement or any of its terms or provisions, including costs, attorney fees, or otherwise. The objecting class member shall be subject to examination by Counsel for the Defendant and Class Counsel at this hearing regarding the nature of the objection.   The Court may

deny a Class member the opportunity to speak or object who does not set forth in writing all

reason(s) for each objection and file the objections and reasons therefore with the Court and

provide a copy to Lead Counsel and Counsel for Defendants not less than thirty (30) days prior to

the hearing.  By filing an objection, each such person understands that Class Counsel or Counsel

for Defendants may notice such objecting person for and take his or her deposition consistent with

the Federal Rules of Civil Procedure, and that said objector(s) shall submit to a deposition in

Central Islip, New York, and shall further submit any documentary evidence or other tangible

things upon which they rely in support of their objection. Failure by an objector to make himself or

herself available for a deposition or comply with expedited discovery requests may result in the

Court striking said objector's objection and otherwise denying that person the opportunity to make

an objection or be further heard.  The Court reserves the right to tax the costs of any such

discovery to the objector or the objector's counsel should the Court determine that the objection is

frivolous or is made for an improper purpose.

F. <u>Motion for Final Court Approval and Entry of Final Judgment</u>: The Motion for

Final Court Approval of this Settlement will be set as soon as is practical and:

The Court in any final approval must find:

1. that it has jurisdiction over the parties and disputes for purposes of the
Settlement, make findings or approve the Settlement under Rule 23 of the Federal Rules of Civil
Procedure, the Class Action Fairness Act, and other applicable law, approve the proposed Notice
and find that the Notice provided in the Settlement Agreement constitutes reasonable and the best
practicable notice reasonably  calculated under the circumstances  to apprise members of the
Class of the pendency of this action, the terms of the Settlement, the right to object, and the right to
appear at the hearing on final approval, that the notice is adequate and sufficient to all persons
entitled to receive such notice, and meets the requirements of due process and other rules or laws;

2. that the Court has exclusive and sole jurisdiction over this settlement,
including its administration, consummation,  claim procedures, enforcement, and any other issues
or questions that may arise, and all proceedings both before and after the final judgment  becomes
final and is no longer subject to appeal, and over enforcement  of the final judgment;

7

3.      that there is no just reason for delay and that the Final Judgment shall be final and entered;

4.      that any and all claims class members may have for any and all causes of action against Schell & Kampeter, Inc. d/b/a Diamond Pet Foods, Diamond Pet Food Processors of South Carolina LLC, Costco Wholesale Corporation and all persons and entities that are alleged to have manufactured, tested, distributed, supplied, sold, offered or were otherwise involved in placing the Recalled Pet Food Products which are the subject of the Released Claims into the marketplace, as well as their insurers, parent companies, subsidiaries, affiliates, franchisees, officers, directors, trustees, shareholders, unit holders, governors, managers, employees, agents and assignees, are fully, finally and forever released, extinguished and discharged in consideration of the payments made under this agreement, except for those parties who have opted out pursuant to Section II D.  All claims of class members who did not timely return a claim form or opt out shall be forever extinguished   and barred. This settlement shall extinguish any and all damages and claims arising out of the purchase and/or use of Recalled Pet Food Products by class members;

5.      that any and all claims Defendants may have against Plaintiff Barbara Marciano, each and all of the Class Members and/or Lead Counsel arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement or resolution of the Action and Released Claims are fully, finally and forever released, extinguished and discharged; and

6.      the parties and their counsel agree that they shall not assert or allege in any action, proceeding, or claim, that any party hereto violated Rule 11 of the Federal Rules of Civil Procedure, and the final judgment shall contain a finding that all parties and their counsel complied with the requirements of Rule 11 with respect to the institution, prosecution, defense and resolution of the Action.

G.      Effect of Approval of Settlement and Final Judgment:

If the Court approves the Settlement and the Final Judgment, the claims procedures and distribution   procedures under the Settlement and Final Judgment shall commence.

H.      Effect of Disapproval of Settlement and Final Judgment:

If the Court does not approve the Settlement Agreement or Final Judgment, but suggests modifications, Lead Counsel for the Class and Class Representative and Counsel for Defendants and Defendants reserve the right to consent to the modifications. If the Court does not approve the Settlement Agreement or Final Judgment, then Defendants or the Class Representative may terminate this Settlement Agreement and it shall be null and void except that Defendants shall pay

8

the costs for notice set forth in paragraph II.C and otherwise as provided in this Settlement Agreement. If the Court does not approve the settlement, Defendants reserve the right and do not waive the right to assert any and all defenses, including but not limited to any applicable defenses under Rule 23 of the Federal Rules of Civil Procedure.

III. **STRUCTURE OF SETTLEMENT AND CLAIMS' PROCEDURES**

This Settlement consists of a monetary payment by Defendant, as well as non-monetary, but valuable benefits to Class members, and shall be implemented by and through a mandatory claims process set forth below. Disagreements shall be referred to a third party neutral for a fair, quick, expeditious, inexpensive and binding resolution on Defendant and Class members.

A. <u>Settlement Fund</u>:

The parties have agreed to establish a settlement fund of Two Million Dollars ($2,000,000), subject to the terms and conditions herein. Within ten (10) days after final approval and entry of the final Judgment and the final judgment becoming non-appealable, the Defendants shall pay an amount to the SCA sufficient to pay for the submitted, legitimate claims received by the SCA. Defendants shall also from time to time provide sufficient funds to the SCA such that the SCA can fulfill its responsibilities pursuant to this settlement agreement.

B. <u>Class Members' Damages and Injuries Due to Recall</u>

The parties have agreed to the following subclasses. Class members shall be entitled to those benefits conferred upon each subclass, as may be applicable, as defined below. Each class member shall be bound by the claims procedures defined below:

<u>Sub-Class I</u>:

Defendants will create a settlement fund to reimburse/refund Class Members for the purchase price of recalled pet food products, subject to the conditions set forth herein. This

9

sub-class is limited to class members who: (1) purchased but never used a recalled pet product, never fed his/her pet or animal the recalled product, and the class member discarded or retained the product, did not return the product to the dealer or otherwise exchange the product; or (2) purchased and used a recalled pet product that caused economic damages detailed in Sub-Class II, infra.

The class member shall submit a claim form, substantially in the form set forth in Exhibit 2, together with all other documentation, if any, to the SCA, who shall send a copy to Defendant's representative. Though the SCA may seek clarification or other simple information, unless the SCA in fact does so or the Defendants' representative makes a reasonable good faith objection (for example, without limitation: the consumer purchased a product that was not subject to the recall; the product was purchased in a retail outlet that did not distribute the Defendants' products; that the product was returned or otherwise exchanged by the customer), after clarification and determination of the validity of the Class Member's claim, the SCA shall approve the claim if it fairly and reasonably establishes the type of damage specified in this sub-paragraph.

In order to establish a claim, a Class Member must provide sufficient information about the purchase or use (or non-use) of the product to satisfy the SCA that the purchaser did, in fact, purchase or otherwise receive (example: as a gift) a product subject to the recall.  Examples of "sufficient information" to satisfy the SCA would include, without limitation: a sworn statement signed by the purchaser representing the nature of the purchase, the purchase date, the name of the dealer from whom the product was purchased, the quantity purchased, the product purchased and information as to whether the product was used, not used, discarded, returned, exchanged; or cancelled check(s); or copies of receipts (such as cash register receipts) from the dealer; or copies of credit card summaries.  The Class Member in submitting a claim shall receive one of the

10

following:

        1. payment up to a maximum value of two (2) bags of pet food per pet or animal;

        OR in the event that total claims exceed the amount of the settlement fund for this Sub-Class,

        2.  a pro rata share of the net proceeds of the Settlement fund for this Sub-Class not to exceed the actual or estimated purchase price of up to two (2) bags of the pet food per pet described by the Class Member.

A putative member of this Sub-Class who has already obtained a product refund or exchange from Defendants (or their insurance carrier) or any other entity in the chain of distribution of the Recalled Pet Food Products is not entitled to relief from the Settlement Fund.

The fund for this sub-class shall be limited to a total maximum of $750,000. Defendants shall fund proffered legitimate claims in this sub-class in increments of $250,000 as such claims are fulfilled. Any unpaid funds for this sub-class shall be subject to a reversion to Defendants.

        <u>Sub-Class II</u>:

Defendants will create a settlement fund for class members who, in addition to having purchased or used a recalled pet food product, sustained economic damages as a result of injury or death to animals from their consumption of a recalled product.

The class member shall submit a claim form, substantially in the form set forth in Exhibit 2, together with all other documentation, if any, to the SCA who shall provide a copy to Plaintiffs' and Defendants' representatives.  Though the SCA may seek clarification or other information, unless the SCA in fact does or the defendant's representative makes a substantial reasonable good faith objection (for example, without limitation: the consumer purchased a product that was not subject to the recall; the product was purchased in the state or area not subject to the recall; the product was purchased in a retail outlet that did not distribute the defendant's product; the product

was returned or otherwise exchanged by the customer; the veterinary bill was not incurred or was unreasonable or unnecessary; etc.), the SCA shall honor and approve the claim if it fairly and reasonably establishes the type and damage specified in this subparagraph.

In order to establish a claim, a class member must provide sufficient information about the purchase or use of the products to satisfy the SCA that the purchaser did in fact purchase or otherwise receive (example: as a gift) a product subject to the recall. Examples of "sufficient information" to satisfy the SCA would include, without limitation, a sworn statement signed by the purchaser representing the nature of the purchase, the purchase date, the name of the dealer from whom the product was purchased, the quantity purchased, the product purchased and information as to whether the product was used, not used, discarded, returned, exchanged; or cancelled checks; or copies of receipts (such as cash register receipts) from the dealer; or copies of credit card summaries or cancelled checks.

With regard to the veterinary bill, in establishing the cost of the veterinary bill or charge, the class member must provide a billing, letter, or writing from a veterinarian or testing laboratory or facility, so as to reasonably establish veterinarian charges and/or testing charges, and that such charges were, in fact, incurred and related to salmonella testing and/or treatment of salmonella or salmonella-like symptoms. Though the SCA may seek clarification or other information, unless the SCA in fact does so or the Defendant's representative makes a substantial, reasonable good faith objection (i.e., the consumer purchased a product that was not subject to the recall; the product was not subject to a recall; the product was purchased at a retail facility that did not carry the Defendant's products; veterinarian bill includes costs for a unrelated services; the veterinarian bill was not incurred or was not reasonable), the SCA shall approve the claim if it fairly and reasonably establishes the type of damages specified in this sub-paragraph. The SCA shall be

entitled, as necessary, to obtain from the class member specific authorization for the SCA (or

counsel on behalf of the Defendants) to obtain any and all veterinary records as may be deemed to

be necessary in their determination of the claim and in regard to any potential objections thereto. A

Class Member having submitted a claim deemed valid shall receive the following:

        1.    a full reimbursement of the actual cost of veterinarian testing, care and/or
treatment.  However, Defendants shall not be required to reimburse for any other portion of the
veterinary bill unrelated to suspected or actual salmonella illness. Furthermore, Defendants shall
reimburse only for veterinary or related charges deemed reasonable, necessary and typical within
the Class Member's community;

        OR in the event that total claims exceed and exhaust the amount of the Settlement
fund for this Sub-Class;

        2.    a pro rata share of the net proceeds of the settlement fund for this Sub-Class.

        AND if applicable,

        3.    the relief with respect to the purchase price of the product as set forth in
            Sub-Class I, subject to the submission of proof required for said Sub-Class
            Members.

If death of a pet or animal is claimed, the Class member shall explain in detail the cause of

death, the date of death, and licensed veterinarian's statement that connects the pet or animal's

death to the ingestion of a product subject to the recall.  Though the SCA may seek clarification

or other information, unless the SCA in fact does so or the Defendant's representative makes a

substantial, reasonable good faith objection or offers a valid defense (i.e., the consumer purchased

a product that was not subject to the recall; the product was purchased in a retail facility that did

not offer the Defendant's products for sale; the reasons why the value of the pet or animal is

excessive; the death of the pet or animal was not due to salmonella), the SCA will consider and

approve the claim if it fairly, reasonably, and satisfactorily establishes  the type of injury or

damages specified in this sub-paragraph.  If the SCA approves the claim, the SCA shall send the

13

Class Member the following:

       1.    the fair market value or a pro rata share (if the settlement fund for this sub-class is exhausted) of the market value of the pet or animal;

       AND if applicable,

       2.    the relief for veterinary care set forth in this Section;

       AND if applicable,

       3.    the relief with respect to the purchase price of the product as set forth in Sub-Class I, subject to the submission of proof required for said Sub-Class Members.

A putative member of this Sub-Class who has already settled a claim with Defendants (or the Defendant's insurance carrier) and who has not executed a release in connection therewith, may submit a claim for relief from the Settlement Fund, in the manner and subject to the requirements set forth herein. The SCA, subject to consultation with Class Counsel and Defendant's Counsel, shall determine whether any recovery from the Settlement Fund beyond the amount already paid by Defendants and/or their insurance carrier in the settlement is warranted.

The fund for this sub-class shall be limited to a total maximum of One Million Two Hundred and Fifth Thousand Dollars (1,250,000), Five Hundred Thousand Dollars ($500,000) of which would be subject to potential reversion if unclaimed. Unclaimed funds that are not subject to reversion shall be paid to North Shore Animal League America, a not-for profit charitable organization which is the world's largest no-kill animal rescue and adoption organization.   .

    <u>Sub-Class III</u>:

Defendants will provide relief in the form of coupons for class members who purchased pet food products subject to the recalls and fully utilized the products (i.e., fed the products to their pets or animals) with no resultant ill effects.

The class member shall submit a claim form, substantially in the form set forth in Exhibit 2, together with all other documentation, if any, to the SCA, who shall send a copy to Defendant's representative. Though the SCA may seek clarification or other simple information, unless the SCA in fact does so or the Defendants' representative makes a reasonable good faith objection (for example, without limitation: the consumer purchased a product that was not subject to the recall; the product was purchased in a retail outlet that did not distribute the Defendants' products; that the product was returned or otherwise exchanged by the customer), the SCA shall approve the claim if it fairly and reasonably establishes the type of damage specified in this sub-paragraph.

In order to establish a claim, a Class Member must provide sufficient information about the purchase or use (or non-use) of the product to satisfy the SCA that the purchaser did, in fact, purchase or otherwise receive (example: as a gift) a product subject to the recall. Examples of "sufficient information" to satisfy the SCA would include, without limitation: a sworn statement signed by the purchaser representing the nature of the purchase, the purchase date, the name of the dealer from whom the product was purchased, the quantity purchased, the product purchased and information as to whether the product was used, not used, discarded, returned, exchanged; or cancelled check(s); or copies of receipts (such as cash register receipts) from the dealer; or copies of credit card summaries.

The Class Member in submitting a claim shall receive no more than two (2) coupons for the purchase of a pet food product manufactured by defendant Schell & Kampeter, Inc. d/b/a Diamond Pet Foods.

The total maximum value of such coupons shall be $100,000, each with a face value of Two Dollars ($2) to a maximum of 50,000 coupons.

    C.    <u>Notification to Claimants and Binding Arbitration</u>

The SCA will notify Defendants when the processing of all claims is complete. Within fourteen (14) days of such notification, Defendants shall advise the SCA and Plaintiff's Counsel as to the claims they wish to review, whether it be all claims, or some sub-set of the claims. Within seven (7) days of Defendants' request, the SCA shall provide the Defendants with the requested claims materials, and Defendants shall have sixty (60) days to review such claims and notify the SCA and Plaintiff's Counsel as to any objections to the SCA's disposition of any claim or claims. The SCA will process the claims to which Defendants do not object, and the disputed claims will be resolved by the Parties in good faith or, in the event a good faith resolution is not reached, submitted to the Court for review and resolution. Following the Court's determination with respect to any disputed claims, the SCA shall notify all such claimants regarding the acceptance or rejection of their claims. Any claimant who objects to the disposition of the claim will have thirty (30) days to challenge the decision by notifying the SCA in writing, explaining in detail the reason for the disagreement. The SCA shall notify Defendants and Plaintiff's counsel of any challenged claims, and those claims will be forwarded to the Court. Thereafter, the Court will review the claim, seek any clarification from the class member it deems appropriate and make a binding decisions regarding the claim.

D.    Timing of Payment

All checks shall be mailed or distributed to Class members within six (6) months of the Final Judgment becoming final and non-appealable.

IV.    INJUNCTIVE RELIEF

Defendant Schell & Kampeter, Inc. d/b/a Diamond Pet Foods will employ for three (3) years from the date of the Approval of the settlement and Final Judgment new and improved quality control procedures and therapeutic reforms that had not been implemented prior to the

16

placement of the Recalled Pet Food Products into the market place.   One time per year, Plaintiff has a right to visually inspect defendants Schell & Kampeter, Inc.'s Gaston, South Carolina, manufacturing facility to ensure that the standards are being employed. Such visual inspection shall be carried out by Plaintiff or an entity selected by Class Counsel, upon sixty (60) days written notice to defendant Schell & Kampeter, Inc. d/b/a Diamond Pet Foods. Said inspection must be scheduled on date convenient to defendant Schell & Kampeter, Inc. and not interfere with the operation of defendant's facility.   All costs associated with the visual inspection conducted by Plaintiff or its selected entity shall be borne by Class Counsel.

## V.     OTHER PROVISIONS

A.     No Admission: Nothing herein shall constitute an admission of fact or law or be construed or interpreted as any admission as to any assertion, claim, or allegation made by any party.   Defendants specifically denies any wrongdoing or liability, and this Settlement is entered to resolve all claims amicably and does not imply or suggest in any way fault or wrongdoing.

B.     Attorney's fee:   Class Counsel will apply to the Court for payment of attorneys' fees in a total amount not to exceed 20% of the Settlement Fund (maximum of $400,000) and will be no less than $150,000.   Defendants shall not object to Class Counsel's fee.   Payment of Class Counsel's fees shall be made within 7 days of final approval of the Settlement.

C.     Binding effect: Once approved by the Court, this Settlement Agreement shall be binding upon and inure to the benefit of each member of the Class and their successors and assigns as well as to Defendant, its parents, affiliates, subsidiaries, officers, directors, managers, agents, representatives, employees, and successors and assigns. The settlement shall serve as a release of all claims that were brought or could have been brought as a result of class members use of recalled products.

17

D.    Choice of Law: This Settlement Agreement shall be governed by and interpreted according to the substantive law of the State of New York.

E.    Execution of Counterparts: The signatories may execute this Agreement in counterparts, each of which shall be deemed an original. An originally executed version of this Settlement Agreement need not be submitted to the Court in lieu of an electronic filing.

F.    Entire Agreement: This Settlement Agreement, with its exhibits and appendices, constitutes the entire and complete agreement.

G.    Notices:  Any notice as to any dispute arising under this Settlement Agreement shall be sent by United States mail, first class to counsel for the parties at the addresses listed below:

Class Counsel:

Mario Alba, Jr., Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 454-7700

Defendants' Counsel:

Gerard Benvenuto, Esq.
Traub Lieberman Straus & Shrewsberry LLP
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532
(914) 347-2600

IN WITNESS WHEREOF, the Parties do hereby execute this Settlement Agreement.

BARBARA MARCIANO

Sworn to and subscribed before me
this 29 day of January, 2014

Notary Public

SOFIA GIANNOULIS
Notary Public, State of New York
Qualified in Nassau County
No. 01GI6263432
My Commission Expires 05/11/2016

18

SCHELL & KAMPETER, INC.

By: _____
     Mark Schell

Sworn to and subscribed before me
this 28 day of January, 2014

_____
Notary Public

BRENDA K. WANSING
Notary Public - Notary Seal
STATE OF MISSOURI
County of Osage
My Commission Expires 5/16/2015
Commission # 11188588

COSTCO WHOLESALE CORP.

By: _____

Sworn to and subscribed before me
this ___ day of January ___, 2014

_____
Notary Public

STEFANIE G. PARMENTER
COMMISSION EXPIRES
NOTARY
PUBLIC
5-29-17
STATE OF WASHINGTON

19

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

| | |
|---|---|
| Cynthia Roseberry-Andrews | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Schell & Kampeter, Inc. et al | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No.  GJH 15-cv-1503

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Schell & Kampeter, Inc.
d/b/a Diamond Pet Foods
103 North Olive Street
Meta, MO 65058

# EXHIBIT 3

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Cynthia Roseberry-Andrews
PO Box 711
North Beach, MD 20714

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  08/12/2015

*Sign.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CYNTHIA ROSEBERRY-ANDREWS | ◊ | Civil Action No: GJH-15-CV-1503 |
|  | ◊ |  |
| Plaintiff, | ◊ |  |
|  | ◊ | **AMENDED** |
|  | ◊ |  |
| vs. | ◊ | COMPLAINT FOR NEGLIGENCE, BREACH |
|  | ◊ | OF EXPRESS WARRANTY, BREACH OF |
|  | ◊ | IMPLIED WARRANTY, STRICT PRODUCT |
| SCHELL & KAMPETER, INC. d/b/a | ◊ | LIABILITY, UNJUST ENRICHMENT, FRAUD, |
| DIAMOND PET FOODS, AND DIAMOND | ◊ | AND VIOLATIONS OF MARYLAND CODE |
| PET FOODS INC. | ◊ | COMMERCIAL LAW TITLES 11, 13, AND 14 |
| Defendants, | ◊ |  |
|  | ◊ | **JURY TRIAL DEMAND** |
|  | ◊ |  |

Plaintiff Cynthia Roseberry-Andrews files this Complaint against Defendants Schell & Kampeter, Inc., a Missouri corporation d/b/a Diamond Pet Foods, Diamond Pet Foods Inc. a Missouri corporation, (collectively, "Diamond"), and alleges as follows:

### INTRODUCTION

1. Diamond is a leading North American manufacturer of pet food products ("Pet Food") sold by supermarket retailers, mass merchandisers, pet specialty retailers, farm supply retailers, and other wholesale and retail outlets, including Wal-Mart, Costco, PetSmart, Inc., Target, and other large retail chains. Diamond produces millions of bags of Pet Food annually.

2. Diamond designed, manufactured, marketed, advertised and warranted its Pet Food as fit for consumption by domesticated animals and free from defects. As alleged herein, the Pet Food was not fit for its stated or intended purpose.

3. In or about April 2012, the U.S. Food and Drug Administration (hereinafter "FDA"), in collaboration with the Centers for Disease Control (hereinafter "CDC") and other state and local officials, investigated a multi-state outbreak of Salmonella Infantis ("Salmonella") infections. The FDA's investigation was prompted by Department of Agriculture officials from various states who reported they discovered Salmonella in unopened and sealed packages of Diamond brands.

4. The FDA's investigation revealed that a total of 14 people from nine different states were infected by the outbreak. Moreover, the investigation revealed that these individuals were exposed to Diamond brands.

5. Subsequently, the FDA's Center for Veterinary Medicine ("FDA CVM") detected a strain of the Salmonella virus at Diamond's manufacturing plant in Gaston, South Carolina. On or about 7 April 2012, in response to the FDA CVM findings, Diamond shut down its operations at that plant. The FDA, following its 12 April 2012 thru 20 April 2012 investigation, made four observations related to unsanitary and unsafe conditions.

6. Diamond produces numerous brands under its own name such as Diamond Naturals® and Taste of the Wild® as well as several "private label" brands for other companies such as Apex® and Canidae®.

7. Starting on 6 April 2012, Diamond initiated several recalls of its Pet Food due to Salmonella. In all, Diamond recalled nine brands of Pet Food. Additionally, Apex® and Canidae® issued recalls for Pet Foods sold under their names.

8. On 17 April 2012, Plaintiff purchased Diamond Naturals dry dog food, one of a series of brands manufactured by Diamond and one of the nine recalled brands of Pet Food.

9. Plaintiff subsequently fed only Diamond Naturals to her two American Kennel Club (AKC) Champion dogs; Roseberry's Vierzig Tages "Claudia," and Roseberry's RD 2 Damascus Experience "Damascus."

10. Since ingesting Diamond Naturals both Claudia and Damascus became extremely ill and Claudia died. Damascus experienced lethargy, some nausea, stumbling and falling, and subsequently died.

11. Accordingly, this lawsuit is brought on behalf of the Plaintiff who purchased tainted pet food produced, manufactured, distributed, redistributed, marketed, advertised, labeled, handled, supplied, sold and/or resold by Defendants.

12.  Not only did the Plaintiff not receive the benefit of her bargain when she purchased Defendants' tainted pet food that she would not otherwise have purchased, but she suffered financial or actual damage.

## PARTIES

13.  At all relevant times, Plaintiff resided in Calvert County, Maryland.  On 17 April 2012, Plaintiff purchased Diamond Naturals Pet from Southern States in Huntingtown, Calvert County Maryland.  Plaintiff's dogs began consuming Defendants' recalled Diamond Naturals on 17 April 2012.

14.  Defendant Schell & Kampeter, Inc., d/b/a Diamond Pet Foods ("Schell & Kampeter") is a Missouri corporation.  Schell & Kampeter is authorized to conduct business in the State of Maryland.

15.  Defendant Diamond is a Missouri corporation with its principal place of business located at 103 North Olive Street, Meta, Missouri 65058.  Diamond is a wholly-owned subsidiary of Defendant Schell & Kampeter, both companies share a number of common senior managing officers.  Diamond manufacturers dry and canned food for dogs and cats, as well as other pet food items.  Diamond serves top breeders, kennel owners, sporting enthusiasts, and family pet owners worldwide.  Diamond produces numerous brands under its own name and "private label" brands for companies such as Apex®, Costco®, and Canidae®.

## JURISDICTION AND VENUE

16.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and over supplemental state law claims pursuant to 28 U.S.C. § 1367.

17.  Venue properly lies in the District pursuant to 28 U.S.C. § 1391(a), because Plaintiff resides and Defendants reside, and are found, have their principal place of business, have an agent, or have transacted substantial business within the Southern District of Maryland within the meaning of 28 U.S.C. § 1391(a), as defined in 28 U.S.C. § 1391(c), and because a substantial part of events giving rise to the claims alleged herein occurred in the Southern District of Maryland. Specifically, Defendants marketed and sold their Pet Food throughout the State of Maryland,

including throughout this District, and Plaintiff purchased Defendants' tainted Pet Food from retail outlets located within this District.

## SUBSTANTIVE ALLEGATIONS
### Defendants and Their Tainted Pet Food

18.  Diamond is in the business of manufacturing, producing, distributing, and/or selling Pet Food under various brand names.  Diamond produces several different Pet Food products for themselves, as well as for private labels, each year, including the following brand names:

- o   Chicken Soup for the Pet Lover's Soul®
- o   Taste of the Wild®
- o   Diamond®
- o   Diamond Naturals®
- o   Premium Edge®
- o   Professional®
- o   4Health®
- o   Apex®
- o   Kirkland Signature®
- o   Canidae®

19.  Diamond sells its Pet Food throughout the United States, and a substantial portion of Diamond's Pet Food is sold throughout the State of Maryland.  Upon information and belief, Diamond has sold, either directly or indirectly, millions of units of defective Pet Food and Pet Food products throughout the United States, including throughout the State of Maryland.

20.  Upon information and belief, Diamond produces, on average, approximately 2.8 million bags and/or approximately 260,000 tons of Pet Food per year and has annual revenues of $39.2 million.

21.  Beginning in or around April 2012, the FDA, in collaboration with the CDC and other state and local officials, investigated a multi-state outbreak of Salmonella infections.  The FDA became involved when they were contacted by Department of Agriculture officials from various states who reported they discovered Salmonella in unopened and sealed packages of Diamond's

brands.

22.   The investigation revealed that a total of 14 people infected by the outbreak were reported from nine states.  The investigation uncovered that these individuals were exposed to Diamond's brands.

23.   Subsequently, the FDA CVM indentified a strain of Salmonella at Diamond's plant in Gaston, South Carolina.  On 7 April 2012, and in response to the FDA CVM findings, Diamond shut down its operations at the Gaston plant.

24.   The FDA, in conducting an inspection of the Gaston plant from 12 April 2012 through 20 April 2012, observed the following conditions:

(a)   *"All reasonable precautions are not taken to ensure that production procedures do not contribute contamination from any source."* Specifically, no microbiological analysis was conducted or there was no assurance that animal fat would not introduce pathogens into the product.  Additionally, Diamond's sampling procedure did not account for potential adulteration after sampling or during storage.

(b)   *"Failure to provide hand washing and hand sanitizing facilities at each location in the plant where needed."*  Specifically, there were no facilities for hand washing or hand sanitizing in production areas where there was direct contact with exposed finish product.

(c)   *"Failure to maintain equipment, containers and utensils used to convey, hold and store food in a manner that protects against contamination,"*  Specifically, certain paddles in the convey had gouges and cuts.  The damaged areas were potential harbors for microorganisms and were difficult to clean and sanitize.

(d)   *"Failure to maintain equipment, so as to facilitate cleaning of the equipment."*  Specifically, Diamond utilized cardboard, duct tape and other non-cleanable materials on equipment.  Residue was found on these surfaces.  Additionally, foam gaskets around access doors to the bucket elevators were in poor condition, and exhibited an accumulation of residue and dust.

25. On 6 April 2012, Diamond recalled Diamond Naturals® Lamb Meal & Rice.

26. On 26 April 2012, Diamond expanded the recall to include Chicken Soup for the Pet Lover's Soul®.

27. On 30 April 2012, Diamond again expanded the recall to include Diamond® Puppy Formula.

28. On 4 May 2012, Apex® announced a recall of Apex® Dog Food manufactured by Diamond on 24 January 2012.

29. On 5 May 2012, Diamond vastly expanded the recall, this time including all products of the following brands between 9 December 2011 and 7 April 2012:  Chicken Soup for the Pet Lover's Soul®; Country Value®; Diamond®; Diamond Naturals®; Premium Edge®; Professional®; 4Health®; and Taste of the Wild®.

30. Also on 5 May 2012, Canidae® announced a recall of its Pet Food that was manufactured by Diamond between 9 December 2011 and 31 January 2012.

31. On 21 May 2012, Diamond expanded the recall to include its Diamond Naturals® Small Breed Adult Dog Lamb & Rice Formula dry dog food manufactured on 26 August 2011.

32. In total Diamond Pet Foods recalled nine brands of Pet Food – eight brands under the Diamond label and one under the Kirkland® Signature label.  Additionally, two other companies – Apex® and Canidae® issued recalls for its Pet Food produced or manufactured by Diamond.  The brands and labels of recalled pet food described in paragraphs 25-31 are collectively referred to at "Recalled Pet Food."

## PLAINTIFF'S FACTUAL ALLEGATIONS

33. In March 2012 Plaintiff purchased Diamond Naturals® from Southern States store in Huntingtown, Maryland.

34. Over the course of almost a month, Plaintiff fed Diamond Naturals® to her two AKC Champion dogs.  Diamond Naturals® was the only source of food for the Plaintiff's dogs during that time.  Roseberry's Vierzig Tages "Claudia" became extremely ill and died.  Roseberry's RD 2 Damascus Experience "Damascus," experienced lethargy, some nausea, and stumbling and falling.

35.  Prior to the recall, Defendants never warned Plaintiff or the store that she purchased the Diamond Naturals® that the Recalled Pet Food would cause her dogs to have health problems (and, worse, potentially die).

36.  As a result of Plaintiff's purchase of the Recalled Pet Food, as set forth above, Plaintiff has suffered and will suffer damages, including, but not limited to:

      (a)     the costs of veterinarian, treatment, medicines, mileage/trips to make such visits for diagnosis and treatment, and otherwise;

      (b)     the consequential and incidental damages, such as the loss and disability of Plaintiff's dogs, Plaintiff's loss of all fees and expenses incurred to champion her dogs, the Plaintiff's loss of potential business income; and

      (c)     the costs of returning the Pet Food to the store, the extensive time to correspond in writing, email, and via telephone with the Defendants.

## COUNT I
## Breach of Implied Warranty

37.  Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

38.  Defendants manufactured, marketed, sold or distributed Pet Food.

39.  At the time that Defendants manufactured, marketed, sold or distributed Pet Food, Defendants knew of the purpose for which the Pet Food was intended and impliedly warranted that their Pet Food was of merchantable quality and safe and fit for ordinary use.

40.  Plaintiff reasonably relied upon the skill, superior knowledge and judgment of the Defendants as to whether the Pet Food was of merchantable quality and safe and fit for ordinary use.

41.  Due to Defendants' wrongful conduct as alleged herein, Plaintiff could not have known about the risks and side effects associated with Defendants' Recalled Pet Food until after ingestion by Plaintiff's dogs.

42.  In breach of said implied warranty, the Recalled Pet Food was not of merchantable quality and was not safe or fit for ordinary use.

43.  As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff suffered damages as alleged herein.

## COUNT II
### Breach of Express Warranty

44.  Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

45.  Defendants expressly warranted that their Pet Food was safe for consumption by pets.

46.  Defendants' Recalled Pet Food did not conform to this express warranty because the Recalled Pet Food was and is not safe and causes/caused serious harm to pets including death.

47.  As direct and proximate result of the breach of said warranties, and as the direct and legal result of the defective condition of Defendants' Recalled Pet Food as manufactured and/or supplied by Defendants, and other wrongdoing of Defendants described herein, Plaintiff was injured and suffered damage.

## COUNT III
### Negligence

48.  Plaintiff hereby adopts and incorporates by reference every allegation set forth in

paragraphs 1-36 above as if fully set forth herein.

49. Defendants owed Plaintiff a duty to only offer for sale safe, non-contaminated Pet Food for consumption by household pets.

50. Through their failure to exercise due care, Defendants breached this duty by producing, processing, manufacturing, and/or offering for sale contaminated Pet Food in a defective condition that was unhealthy and/or lethal to Plaintiff's show dogs.

51. Additionally, Defendants breached their duty of care to Plaintiff by failing to use sufficient quality control, perform adequate testing, proper manufacturing production, or processing, and failing to take sufficient measures to prevent the Recalled Pet Food from being offered for sale, sold, or fed to pets.

52. Defendants knew or, in the exercise of reasonable care should have known that their Pet Food presented an unacceptable risk to the Plaintiffs dogs, and would result in damage that was foreseeable and reasonably avoidable.

53. As a direct and proximate result of Defendants' above-referenced negligence, the Plaintiff has suffered damages.

## COUNT VI
### Strict Product Liability

54. Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-66 above as if fully set forth herein.

55. Defendants are producers, manufacturers and/or distributors of Pet Food.

56. Defendants produced, manufactured, and/or distributed the Recalled Pet Food that was defective in design or formulation in that, when the Recalled Pet Food left the hands of Defendants, the foreseeable risks exceeded the benefits associated with the design or formulation.

57. Defendants' Pet Food was expected to, and did, reach the Plaintiff without substantial change in condition.

58. Alternately, the Recalled Pet Food manufactured and/or supplied by Defendants was defective in design and/;or formulation in that, when it left the hands of Defendants, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other Pet Food products without concomitant accurate information and warnings accompanying the Recalled Pet Food for Plaintiff to rely upon.

59. Defendants produced, manufactured and/or distributed the Recalled Pet Food that was defective due to inadequate warning, testing, study, and/or reporting regarding the results of same.

60. Defendants produced, manufactured and/or distributed the Recalled Pet Food that was defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury from the Recalled Pet Food, Defendants failed to immediately provide adequate warnings to the Plaintiff and the public.

61. As the direct and legal result of the defective condition of the Recalled Pet Food as produced, manufactured, and/or distributed by Defendants, and of the negligence, carelessness, other wrongful and actions of Defendants described herein, Plaintiff suffered damages.

## COUNT V
### Unjust Enrichment

62. Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

63. As a direct, proximate, and foreseeable result of Defendants' acts and otherwise wrongful conduct, Plaintiff suffered damages. Defendants profited and benefited from the sale of the Recalled Pet Food while the Recalled Pet Food caused Plaintiff to incur damages.

64. Defendants have voluntarily accepted and retained these profits and benefits, derived from consumers, including Plaintiff, will full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, consumers, including Plaintiff, were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants or that reasonable consumers expected.  Plaintiff purchased Pet Food that she expected would be safe and

healthy for her dogs and instead has now had to endure the illness of Damascus, and illness and eventual death of Claudia.

65.   By virtue of the wrongdoing alleged in this Complaint, Defendants have been unjustly enriched at the expense of the Plaintiff, who is entitled to, and hereby seeks, the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

66.   Plaintiff has no adequate remedy at law.

## COUNT VI
### Violations of Maryland Code - Commercial Law
### Title 11 – Trade Regulation
### Section 11-703 - False Advertising

67.   Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

68.   Title 11 provides that: "A person may not advertise falsely in the conduct of any business, trade, or commerce or in the provision of any service."

69.   As alleged fully above, Defendants engaged in false advertising within the meaning of the Unfair Trade Practices Statutes, namely representing and marketing their Pet Food as a quality and safe product.

70.   As alleged fully above, Defendants engaged in false advertising within the meaning of Unfair Trade Practices Statutes, namely, by manufacturing, distributing, supplying and/or selling defective products to the Plaintiff.

71.   By virtue of the foregoing, Defendants have violated the Maryland Commercial Law, Title 14 - Miscellaneous Consumer Protection Provisions, Subtitle 29 - False Advertising and Related Crimes.

72. As a consequence of Defendants' conduct, Plaintiff has suffered injury and ascertainable loss.

**COUNT VII**

**Violations of Maryland Code - Commercial Law**

**Title 13 - Consumer Protection Act**

**Subtitle 3 - Unfair or Deceptive Trade Practices**

73. Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

74. Title 13 provides that it is unlawful to engage in unfair or deceptive trade practices. Title 13 § 302 "Deception or Damage Unnecessary" provides that: "Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." § 13-301 provides that: "Unfair or deceptive trade practices defined" include any: "(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; . . . ,

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; . . . .

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; . . .

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:  et.al."

75. As alleged fully above, Defendants engaged in deceptive acts and practices within the meaning of Unfair Trade Practices Statutes, namely, by representing and marketing their Pet Food as a quality and safe product.

76. As alleged fully above, Defendants engaged in deceptive acts and practices within the meaning of Unfair Trade Practices Statutes, namely, by manufacturing, distributing, supplying and/or selling defective products to the Plaintiff.

77. By virtue of the foregoing, Defendants have violated the Maryland Commercial Law, Title 13 Consumer Protection Act, Subtitle 3 Unfair or Deceptive Trade Practices.

78. As a consequence of Defendants' conduct, Plaintiff has suffered injury and ascertainable loss.

## COUNT VIII
### Violations of Maryland Code - Commercial Law
### Title 14 - Miscellaneous Consumer Protection Provisions
### Subtitle 29 - False Advertising and Related Crimes

79. Plaintiff hereby adopts and incorporates by reference every allegation set forth in paragraphs 1-36 above as if fully set forth herein.

80. Title 14 § 2902 provides that it is unlawful to represent a: " False statement.- For the purpose of purchasing, selling, or disposing of property or a service, a person may not advertise a statement containing a representation of fact that the person knows, or by the exercise of reasonable care should know, to be untrue, deceptive, or misleading."

81. As alleged fully above, Defendants engaged in false advertising within the meaning of the Unfair Trade Practices Statutes, namely representing and marketing their Pet Food as a quality and safe product.

82. As alleged fully above, Defendants engaged in false advertising within the meaning of Unfair Trade Practices Statutes, namely, by manufacturing, distributing, supplying and/or selling defective products to the Plaintiff.

83. By virtue of the foregoing, Defendants have violated the Maryland Commercial Law, Title 14 - Miscellaneous Consumer Protection Provisions, Subtitle 29 - False Advertising and Related Crimes.

84. As a consequence of Defendants' conduct, Plaintiff has suffered injury and ascertainable loss.

WHEREFORE, Plaintiff prays for relief and judgment against the Defendants as follows:

(a)   Awarding actual and consequential damages;

(b)   Awarding treble damages

(c)   Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiff;

(d)   Awarding injunctive relief;

(e)   Awarding declaratory relief;

(f)   For pre- and post-judgment interest as allowed by law;

(g)   For reasonable attorneys' fees and costs to counsel if and when pecuniary and non-pecuniary benefits are obtained; and

(h)   Granting such other and further relief as is just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted on 22 July 2015,

Cynthia Roseberry-Andrews
PO Box 711
North Beach, MD 20714
402-470-2169

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CYNTHIA ROSEBERRY-ANDREWS | 2015 MAY 22 PM 11: 39<br>SCHELL & KAMPETER, INC. d/b/a DIAMOND PET FOODS, CO INT<br>AND DIAMOND PET FOODS, INC. |

| (b) County of Residence of First Listed Plaintiff   Calvert County Maryland<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant   Osage County Missouri<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
|---|---|

| (c) Attorneys (Firm Name, Address, and Telephone Number) | Attorneys (If Known)<br><br>GJH 15 CV 1503 |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government<br>Plaintiff | ☐ 3  Federal Question<br>(U.S. Government Not a Party) |
| ☐ 2  U.S. Government<br>Defendant | ☒ 4  Diversity<br>(Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>& Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>Student Loans<br>(Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>Liability<br>☐ 320 Assault, Libel &<br>Slander<br>☐ 330 Federal Employers'<br>Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>Product Liability<br>☐ 360 Other Personal<br>Injury<br>☐ 362 Personal Injury -<br>Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>Product Liability<br>☐ 367 Health Care/<br>Pharmaceutical<br>Personal Injury<br>Product Liability<br>☐ 368 Asbestos Personal<br>Injury Product<br>Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>Property Damage<br>☐ 385 Property Damage<br>Product Liability | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881<br>☐ 690 Other<br><br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br>Act<br>☐ 720 Labor/Management<br>Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>Act<br>☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>☐ 950 Constitutionality of<br>State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>Accommodations<br>☐ 445 Amer. w/Disabilities -<br>Employment<br>☐ 446 Amer. w/Disabilities -<br>Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>Conditions of<br>Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>Actions | ☐ 870 Taxes (U.S. Plaintiff<br>or Defendant)<br>☐ 871 IRS—Third Party<br>26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original<br>Proceeding    ☐ 2 Removed from<br>State Court    ☐ 3 Remanded from<br>Appellate Court    ☐ 4 Reinstated or<br>Reopened    ☐ 5 Transferred from<br>Another District<br>(specify)    ☐ 6 Multidistrict<br>Litigation

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):<br>28 U.S.C. § 1332(a)<br>Brief description of cause:<br>VIOLATIONS OF MARYLAND CODE COMMERCIAL LAW, COMSUMER PROTECTION, and TRADE REG |
|---|---|

| VII. REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION<br>UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | (See instructions):    JUDGE | DOCKET NUMBER |
|---|---|---|

| DATE<br>05/21/2015 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x

BARBARA MARCIANO, Individually and on :    Civil Action No. 12-cv-02708-SJF-AKT
Behalf of All Others Similarly Situated,    :    **(Consolidated)**

              Plaintiffs,    :    CLASS ACTION

     vs.                         :    DECLARATION OF KENNETH JUE IN
                                 :    FURTHER SUPPORT OF PLAINTIFF'S
SCHELL & KAMPETER, INC., et al.,      :    MOTION FOR FINAL APPROVAL OF
                                 :    SETTLEMENT, NOTICE, PLAN OF
            Defendants.    :    DISTRIBUTION OF SETTLEMENT
——————————————————— x    PROCEEDS AND CLASS CERTIFICATION

# EXHIBIT 2

I, Kenneth Jue, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      I am an adult individual over the age of 18 years and am competent to make this declaration. Unless stated otherwise, I am fully familiar with, and have personal knowledge of, the matters stated in this declaration and am competent to testify about them if called upon to do so.

2.      I am employed as a case manager for Gilardi & Co. LLC ("Gilardi"), located at 3301 Kerner Blvd., San Rafael, California. On February 19, 2014, the Court appointed Gilardi to serve as the Settlement Claims Administrator for the settlement of the above-referenced action (the "Settlement"). I am responsible for supervising the claims administration services provided by Gilardi for the parties in the above-referenced action.

3.      Gilardi was formed in 1984 to assist attorneys with securities, antitrust, consumer protection class actions, and other similar matters. Gilardi specializes in designing, developing, analyzing and implementing settlement administration plans that support due process. During the past 30 years, Gilardi has administered class notice and class settlements in over 1,400 class actions, and has distributed more than $6 billion in assets.

4.      In connection with the Settlement, Gilardi undertook the following:

        (a)     established a toll-free phone number to assist callers through an automated Interactive Voice Response ("IVR") telephone system;

        (b)     trained call center representatives to assist potential class members with questions, requests or assistance;

        (c)     established and maintained an interactive Settlement website for purposes of posting Settlement information and general case information, such as the Long Form Notice, the Claim Form, the Order of Preliminary Approval, the Settlement Agreement, and the Complaint;

        (d)     established an online marketing campaign to reach potential class members;

- 1 -

(e)     accepted and maintained documents sent from Settlement class members, including Claim Forms, Requests for Exclusion, and other documents relating to claims administration, and sent paper claim forms upon request; and

(f)     determined the validity and administration of claims for the allocation of benefits.

### Telephone and Email Support

5.     Gilardi worked with counsel to develop a script for the automated IVR telephone system. By March 3, 2014, the toll-free number (877-284-5091) was fully operational. By calling this number, potential class members could listen to answers to frequently asked questions, as well as request a Claim Form. Potential class members could also speak to operators, who had been trained to assist potential class members and answer questions. As of August 27, 2014, Gilardi has received 590 calls to the toll-free number.

6.     Gilardi also maintained an email inbox at info@diamondpetfoodsettlement.com and info@diamondpetfoodssettlment.com. As of August 27, 2014, Gilardi has received 228 emails.

### Informational Website

7.     Gilardi also created a neutral, informational notice website (www.diamondpetfoodsettlement.com and www.diamondpetfoodssettlement.com) (the "Settlement Website") to serve as the notice page of the Settlement where class members can access and print additional information and documents, including the Long Form Notice, the Claim Form, the Order of Preliminary Approval, the Settlement Agreement, and the Complaint. In addition, the Settlement Website includes an interactive online claims submission and processing protocol as well as "Frequently Asked Questions" and "Contact Us" sections.

8.     The Settlement Website became accessible and active on March 3, 2014. As of August 27, 2014, there have been 202,221 unique visitors to the Settlement Website.

## Online Marketing Campaign and Publication Notice

9.      Gilardi, through its media campaign agency Larkspur Design Group, created an online marketing campaign in an attempt to provide notice to as many class members as possible. This campaign utilizes search engine sponsored links from Bing, Google, and Yahoo!, banner ads through Xaxis, social media advertisement on Facebook, and an outreach campaign through Twitter. As of the end of the online marketing campaign, the sponsored links have generated 6,250,798 impressions and 100,833 clicks to the Settlement Website, the banner ads have generated 40,769,559 impressions and 57,636 clicks, the social media advertisement has generated 436,408 impressions and 10,574 clicks, and the outreach campaign via Twitter has produced 119,708 impressions. A true and correct copy of the Notice of Campaign Clippings is attached hereto as Exhibit A.

10.     On March 13, 2014, Gilardi caused the Wire Release to be released through Business Wire. On March 17, 2014, Gilardi caused the initial Publication Notice to be published in *USA Today*. A true and correct copy of the Publication Notice is attached hereto as Exhibit B.

## Claims Received

11.     As of August 27, 2014, Gilardi has received a total of 16,877 claims. The claim filing deadline was July 11, 2014. Of the total 16,877 claims received:

- 12,646 selected Sub-Class 1
- 616 selected Sub-Class 2
- 3,699 selected Sub-Class 3
- 87 selected Sub-Classes 1 and 2
- 1 selected Sub-Classes 1, 2, and 3
- 17 selected Sub-Classes 1 and 3
- 1 selected Sub-Classes 2 and 3
- 23 did not indicate a Sub-Class

Gilardi is working with counsel for the parties to verify the eligibility of the claims submitted.

### Requests for Exclusion and Objections

12.     The filing postmark deadline to submit a Request for Exclusion was April 24, 2014.

As of August 27, 2014, Gilardi has received seven Requests for Exclusion. A true and correct list of

class members who have excluded themselves from the Settlement are attached hereto as Exhibit C.

13.     The filing postmark deadline to submit an Objection was April 28, 2014. As of

August 27, 2014, Gilardi has not received any Objections.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed on August 28, 2014.

_____
KENNETH JUE

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to the email addresses denoted on the attached Electronic Mail Notification List.

/s/ *Mario Alba Jr.*

MARIO ALBA JR.

# Mailing Information for a Case 2:12-cv-02708-SJF-AKT
## Marciano v. Schell & Kampeter, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Robert D. Balin**
  robbalin@dwt.com,NYCDocket@dwt.com

- **Gerard Benvenuto**
  gbenvenuto@traublieberman.com

- **William John Geddish**
  wgeddish@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Mark S. Reich**
  mreich@csgrr.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT A

LARKSPUR
DESIGN
GROUP LDG



**Bing Sponsored Link**



**Yahoo Sponsored Link**

LARKSPUR
DESIGN
GROUP  DG



Facebook Page showing Ad





**Google Sponsored Link**



**Bing Sponsored Link**





Yahoo Sponsored Link



Facebook Page showing Ad



# Diamond Pet Foods - 300x250
## Site: Goodhousekeeping.com

X∧XIS





Subscribe · Win
Good Picks: Healthy Comfort Foods · Iconic Hairstyles · Promotional Offers

Product Reviews | Home & Organizing | Recipes | Diet & Health | Beauty & Style | Relationships | Holidays

NEW TODAY

We Tested It: The Perfect Bacon Bowl

3 Ways to Spot an Email Scam

Transformation Tuesday: "I Lost 150 Pounds"

**WARNING**

Did your pet get sick after consuming certain pet food products?

You could receive payment from a class action settlement

To Learn More Click Here or Call 1-877-284-5091

DON'T MISS

  

18 Signs You Belong in the Country



Take Frozen Ravioli from Everyday to Gourmet

House Tour: A Retro Victorian Home

This Will Inspire Your Next Haircut

PRODUCT NEWS & REVIEWS

Diamond Pet Foods – 728x90

Site: Ivillage.com






Presentation Title | Date

Case 2:12-cv-02708-SJF-AKT   Document 70-1   Filed 08/29/14   Page 8 of 9 PageID #: 825

Diamond Pet Foods – 300x250

Site: USAToday.com



Presentation Title | Date

Diamond Pet Foods — 728x90
Site: Marthastewart.com









**VEGETABLE GARDEN GUIDE**



### Garden Plan & Prep

Whether you're a novice or a pro, find everything you need to plan and grow your garden.

Presentation Title | Date

# EXHIBIT B

## MEDIA

# Cash, questions for 'Business Insider'

## Money is from current investors



**Michael Wolff**
@Michael WolffNYC
Michael@burnrate.com
USA TODAY

*Business Insider*, one of the sites at the forefront of creating a native digital publishing model, happily announced the other day an additional investment of $12 million, bringing its total to about $30 million.

Started by former securities analyst Henry Blodget and DoubleClick founder Kevin Ryan, the site, along with *The Huffington Post, Gawker, BuzzFeed* and Forbes, has helped pioneer a mix of aggregation, free contributions and syndication, along with original reporting and commentary. It has coupled this editorial approach with aggressive traffic-building strategies.

This past fall, *Business Insider* sought to sell itself for $100 million in cash and found no takers (there were merger proposals but no cash offers). Its $12 million in new money comes from existing investors — Amazon.com founder and CEO Jeff Bezos among them — meaning everybody keeps their present ownership stakes, without raising the value of their shares.

This lack of buyers and new investors may suggest a growing uncertainty about what the new publishing model is worth.

What *Business Insider* and other traffic-focused digital publishing businesses have managed to do is amass large audiences. At *Business Insider*, there were 254 million unique visitors in January — *Forbes* and *BuzzReed* are three and four times larger than that. Pretty great publishing numbers.

But the actual meaning and value of large digital audiences remain unclear. Only a small percentage of *Business Insider's* traffic seeks it out and regards it as a worthy destination and a source with particular brand authority. Most other readers land on a *Business Insider* article because of search-engine results or because of an engaging — tabloid-style — headline in a Facebook feed and other social-media promotions, which generate 30% of *Business Insider's* traffic.

In 2013, AP made more than $19 million, most of it selling this traffic to advertisers. It said that it was profitable in the fourth quarter (usually a good quarter) and that it won't be profitable in 2014.

It has to produce lots of content — quantity tending to trump quality — to realize these traffic goals. But *Business Insider* is seeking to be not just a content mill (a site that uses bulk amounts of low-level content to attract mass traffic) but also a significant new brand, which adds costs. It has hired, if not quite a seasoned staff, young journalists with at least a bit of experience: about 70 of them now, costing upward of $15 million a year. Over-head and other traffic-acquisition costs push expenditures well past $19 million. In other words, it costs more to get traffic than what you can sell it for.

In this, *Business Insider* finds itself in the CPM vice. The cost per thousand page views (CPM) — a measurement beginning to be as common in conversations about digital media as movie grosses were in the 1960s — slides ever downward. This is a result of expanded inventory, general unhappiness with the results of digital advertising, lower-valued mobile space and the increasing prevalence of what's called programmatic buying (where-in a targeted audience can be assembled more cheaply outside of brands). In addition, as a site grows and its inventory expands, its CPMs decline. MailOnline, one of the most trafficked news sites, averages $0 million unique visitors a month — more than six times what *Business Insider* receives — but produces only $60 million in revenue, just three times more than *Business Insider's* numbers.

The options for a site such as *Business Insider* for escaping the crunch of ever-increasing traffic costs and ever-lower returns are few.

- You can produce content at a cheaper rate, using the content mill model, say, or the *Forbes* vastly model, letting "contributors" write whatever they want under your brand (as I wrote in *Forbes* ...) and not having to pay them anything — ultimately, of course, devaluing your authority.

- You can concentrate on developing innovative traffic strategies, which might for a time lower traffic costs — but soon enough, your strategies become apparent to everyone else, and all you've succeeded in doing is increasing the pressure for more and more traffic.

- You can figure out a new advertising model. *Business Insider* says it's going to use some of its new money to invest more heavily in video, which gets higher CPMs — but few news sites have unlocked the secret of actually getting people to watch the glut of cheaply-produced digital video.

- You can try to break the CPM model with conferences and subscriptions that conferences, save for the choicest, are a harder ctable, low-margin business. And subscriptions ... well, good luck.

- You could accept a smaller business and make it profitable by carefully controlling your costs — but in the case of *Business Insider*, it's already taken too much investment to settle for a small business.

Still, you build a reputation, gain an audience and develop a reasonably talented staff. In this view, you're poised to become some sort of yet-to-be-defined cross-platform-content-provider-cum-sponsorship-deal business. There is no one revenue strategy is how it's put.

Part of the problem, in classic publishing terms, is that *Business Insider*, like the other traffic aggregators, is not an expression of a particular coherent vision or sensibility that people are compelled to seek out. It is, rather, running after the market instead of creating one.

*Business Insider, BuzzFeed, Gawker,* et al., have created true modern brands — broader larger than their revenue streams and current value. That's a digital conundrum, illusion vs. reality.

You can look at them as works in progress — or as houses of cards.

Caption for image 2: Henry Blodget of Business Insider.


---

## Data-driven journalism soars

### News outlets rush to add to digital arsenal

Roger Yu
@RogerYu
USA TODAY

A thousand attendees at an annual conference for data-loving journalists packed a Marriott in Baltimore this month, reveling in the overflowing job postings and employers' sudden embrace of their obsession.

Data-centric journalism, once the domain of computer geeks, is coming to the forefront. With easier-to-use technology, more data-savvy journalists are pushing the boundaries of what's possible. Heartened by social-media buzz about such stories and prodded by competition hungry for unique content, news organizations are recruiting talent and expanding their menu of stories derived from sophisticated number crunching, explanatory narratives and interactive graphics.

"There's more information now available through more people faster than ever before," says Almar Latour, executive editor of *The Wall Street Journal*. "There's a lot more flexibility in displaying and telling stories."

Data crunchers have been in needle since the 1980s, as computer-assisted reporting gained traction among editors looking to gain an edge. But the lack of computing power, dearth of talent to handle data and heavy costs kept the endeavor in check. "Many tried to make all of their stuff more data-literate, but found limited success," says Rich Gordon, a Northwestern University journalism professor who has launched a program to lure software-savvy students to journalism.

But a confluence of factors has turned data-centric journalism mainstream this month: The recovering economy is spurring more news investment, with venture capitalists pouring money into digital journalism and creating openings for savvy data geeks.

Software that processes data and creates attractive graphics is cheaper, if not free. Cloud technology has lowered the price of storing loads of data.

Among competitors with data-mining in mission statements:
- FiveThirtyEight.com. Nate Silver, the journalist best known for this pursuit, today plans to launch his new ESPN-backed site, a byproduct of the fame earned for his eerily accurate prediction of President Obama's victory in the 2012 election.
- The Upshot. *The New York Times*, which hosted Silver's site until they parted ways last year, will replace it with The Upshot, a policy and economic-analysis blog that will emphasize data and graphics and will be headed by the paper's former Washington bureau chief David Leonhardt.
- Vox.com. A brainchild of former *Washington Post* policy blogger Ezra Klein and published by Vox Media, Vox will launch this year as an explanatory site that aims to make news more digestible by roasting it "to perfection with a driznle of olive oil and hint of sea salt," according to its website. Data and graphics will be integral parts. Vox Media raised about $40 million in venture capital shortly before signing Klein.
- *The Washington Post* will launch an economics blog by reporter Jim Tankersley. "We're going to tell stories about big things in people's lives that demand policy response," Tankersley says. "Data (will) help us animate those stories."
- *The Wall Street Journal* has several data journalism initiatives on tap. Mike Siconolfi was named Investigations editor to preside over a new group that will combine investigative reporters and data reporters under one roof. "Expanding our data-reporting capability in a data-rich age is a priority," wrote Gerard Baker, managing editor of *The Wall Street Journal*, in announcing Siconolfi's appointment.

The Internet lets news entrepreneurs launch sites quickly and without upfront investment. The success of Web-based organizations that found a market with a unique approach — investigative force ProPublica is an example — encouraged others to follow.

That the Internet is awash with mindless click bait creates running room for news outlets to make a mark by offering journalism steeped in evidence, says Al-exander Howard, a data journalist who is a fellow at the Tow Center for Digital Journalism at Columbia University. "A lot of people still want to know facts."

The push to ease handling of data has enhanced other layers of storytelling. A small but growing number of newsrooms are assigning teams of reporters and coders to create "data applications" — software written to allow readers to manipulate and handle data on their own. In a well-received project, NPR tasked its team to comb through data and create an application for parents of disabled children to locate wheelchair-friendly playgrounds.

Editors are pushing for conversations to take place earlier, and designers have help from an array of software that makes it easy to produce maps, time lines and audio-media relatively speedily. "The more you see and read means more of it go viral, newsrooms put more resources into it."

Contributing: Paul Overberg



---

## LEGAL MONDAY

For advertising information: 1.800.872.3433   www.marketplace.usatoday.com

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT AND FINAL SETTLEMENT APPROVAL HEARING**

*(legal notice text)*

---

For more information on how to place your legal notice in Marketplace Today, call 1-800-872-3433

# EXHIBIT C

**Marciano v. Schell & Kampeter, Inc. (Diamond Pet Food Recall Settlement)**
**Requests for Exclusion**

| First Name | Last Name |
| --- | --- |
| DARLENE | MARLEY |
| SUE | TORREY |
| JENNIFER | GRILL |
| ALICE | VOROSMARTI |
| ELIZABETH | KLEWENO |
| MATTHEW | CANTERBURY |
| RANDOLPH | REDDICK |